FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 0 2 2013

JAMES W. McCORMACK, CLERK
By:_____
                        DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

SCOTT HAUKEREID,
Individually and as Personal Representative
and Administrator of the Estate of
ANDREW HAUKEREID, JR., deceased                    PLAINTIFF

v.                    NO. 3:13-cv-00092 DPM

NATIONAL PASSENGER RAILROAD
CORPORATION, t/d/b/a AMTRAK                        DEFENDANT

This case assigned to District Judge MARSHALL
and to Magistrate Judge DEERE

### COMPLAINT

Plaintiff, Scott Haukereid, Individually and as Personal Representative and Administrator of the Estate of Andrew Haukereid, Jr., deceased, for his cause of action against National Passenger Railroad Corporation, t/d/b/a Amtrak ("Amtrak"), states:

### STATEMENT OF JURISDICTION

1. This civil action involves a federal question over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1349. Federal courts have original jurisdiction in civil actions involving Amtrak as such civil actions arise under federal law and, therefore, invoke federal question jurisdiction. 49 U.S.C. § 24301 *et seq.*

2. Venue is proper in this district as a substantial part of the events or omissions giving rise to the claim occurred in Clay County, Arkansas. 28 U.S.C. § 1391.

### PARTIES TO THE CLAIM

3. Scott Haukereid is Administrator of the estate of Andrew Haukereid, Jr., deceased, having been duly appointed by the Clay County Circuit Court. Scott Haukereid is a resident of Woodstock, McHenry County, Illinois.

4. Scott Haukereid brings this action on behalf of himself, the Estate of Andrew Haukereid, Jr., deceased, its heirs, and all statutory wrongful death beneficiaries of Andrew Haukereid, Jr. The wrongful death beneficiaries known at this time include Scott Haukereid and Greg Haukereid, each a son of Andrew Haukereid, Jr.

5. Attached hereto is an Order Appointing Administrator filed of record in the Circuit Court of Clay County, Arkansas, on January 4, 2013. *Exhibit A.*

6. Attached hereto are Letters of Administration filed of record in the Circuit Court of Clay County, Arkansas, on March 1, 2013. *Exhibit B.*

7. The Order Appointing Administrator and Letters of Administration affirm that Scott Haukereid is the Administrator of the Estate of Andrew Haukereid, Jr., deceased, and is the real party in interest entitled to pursue this action under F.R.C.P. 17(a)(1)(B) and all other applicable law.

8. Amtrak is a federally chartered corporation with one hundred percent of the preferred stock owned by the United States government. Amtrak was incorporated under an Act of Congress pursuant to 45 U.S.C. § 501 *et seq.*

## STATEMENT OF THE CASE

9. On May 19, 2012 at approximately 7:00 a.m., Andrew Haukereid, Jr., boarded the Amtrak Texas Eagle #22 in San Antonio, Texas.

10. Andrew Haukereid, Jr., was in route to Chicago, Illinois to celebrate his eightieth birthday with his family. The Amtrak train was scheduled to arrive in Chicago on May 20, 2012 at approximately 1:52 p.m.

11. Andrew Haukereid, Jr. was assisted onto the train by Carole Moreno, his friend. Carole Moreno walked Andrew Haukereid, Jr. onto the train and found him a seat in a coach

near a restroom.

12. Carole Moreno introduced Andrew Haukereid, Jr. to an Amtrak employee that she believed to be the conductor of the train. Carole Moreno told the Amtrak employee that Andrew Haukereid, Jr. was nearly eighty years old and asked the Amtrak employee to keep any eye on Andrew Haukereid, Jr. The Amtrak employee acknowledged Carole Moreno's request.

13. Carole Moreno wrote out instructions for Andrew Haukereid, Jr. for his trip and travel plans.

14. While aboard the Amtrak Texas Eagle, Andrew Haukereid, Jr., had multiple cell phone conversations with Carole Moreno and Scott Haukereid, his son. Andrew Haukereid, Jr. and Scott Haukereid spoke at approximately 3:39 p.m., 4:56 p.m., 10:17 p.m. and 10:33 p.m.

15. Scott Haukereid called Andrew Haukereid at 10:17 p.m. to advise him that he would have one of his vehicles from McHenry Limousines, Inc. pick him up at the Amtrak train terminal in Chicago. Andrew Haukereid, Jr. told Scott Haukereid that he did not think the Amtrak train he was on was going to Chicago. Scott Haukereid thought Andrew Haukereid, Jr., was confused and told him to check with an Amtrak employee to confirm that the train was going to Chicago.

16. Andrew Haukereid, Jr. called Scott Haukereid at 10:33 p.m. and told him that he had spoken with the Amtrak conductor and had confirmed that the train he was on was going to Chicago.

17. When Scott Haukereid ended his 10:33 p.m. cell phone call with Andrew Haukereid, Jr., Scott Haukereid reasonably believed that the Amtrak conductor and Amtrak employees on the Texas Eagle #22 would ensure the safe passage of his father to Chicago. Further, Scott Haukereid reasonably believed that Amtrak and its employees would not abandon

and ignore his father in his confused and disoriented state and allow his father to exit the moving train and fall to his death.

18. Neither Scott Haukereid, Carole Moreno nor Andrew Haukereid, Jr. were aware that scores of elderly and confused passengers had fallen off of moving Amtrak trains to their deaths in the past forty years; that in fact such occurrences were almost a routine occurrence.

19. On information and belief, Andrew Haukereid, Jr., sometime between approximately 2:50 a.m. and 3:00 a.m., in a confused and disoriented state, got up from his seat, exited the seating area of the coach he was traveling and exited the fast moving train to his death.

20. Despite the fact that the crew is required to "walk the train" and ensure passenger safety, Amtrak's employees failed to realize that Andrew Haukereid, Jr. was missing from the train for the approximately 13 hours it took the train to travel to Chicago. Amtrak had no knowledge that Andrew Haukereid, Jr. did not make it to Chicago.

21. The Haukereid family notified Amtrak officials on May 20, 2012 that Andrew Haukereid, Jr. did not arrive in Chicago.

22. A missing persons report was filed for Andrew Haukeried, Jr. in San Antonio.

23. Amtrak police advised Scott Haukereid that Amtrak had reviewed surveillance video from the Chicago and St. Louis stops and the video confirmed that Andrew Haukereid, Jr. did not get off at those stops.

24. Amtrak police advised Scott Haukereid that Amtrak employees last saw Andrew Haukereid, Jr. in Little Rock, Arkansas.

25. On May 29, 2012, the Arkansas State Police issued a "Silver Alert" for Andrew Haukereid, Jr.

26. On June 2, 2012, Andrew Haukereid, Jr.'s eightieth birthday passed.

27. On June 16, 2012, twenty-seven days after Andrew Haukereid, Jr. did not arrive in Chicago, a crew member aboard a northbound Union Pacific train spotted a body of a man later identified to be Andrew Haukereid, Jr approximately twenty feet away from the railroad tracks near Railroad Marker 192 in Corning, Clay County, Arkansas.

28. Andrew Haukereid, Jr.'s body was severely decomposed and partially mummified. Andrew Haukereid, Jr.'s body weighed 41 pounds. His body had maggots both inside and outside. Large amounts of skin were missing. It was apparent that animal activity had disturbed the body.

29. An autopsy performed by the Arkansas State Crime Laboratory indicated Andrew Haukereid suffered multiple rib fractures on the right side, fractured vertebrae in the mid-back, fractured right shoulder blade and a possible jaw fracture. Severe decomposition prevented the crime lab from determining what type of injuries Andrew Haukereid, Jr.'s skin, soft tissues and organs suffered. The only organs the crime lab was able to identify were remnants of liver tissue and dried shrunken remnants of brain tissue.

30. The crime lab determined that Andrew Haukereid Jr.'s injuries were consistent with someone falling from a moving train.

31. During the twenty-seven day search for Andrew Haukereid, Jr., Amtrak police ignored Amtrak's forty year history of having confused, elderly and/or disoriented passengers exit moving trains to their deaths and never once advised Scott Haukereid or Greg Haukereid of the possibility that Andrew Haukereid, Jr. fell off the moving train to his death, nor to Scott Haukereid's or Greg Haukereid's knowledge investigated that possibility.

32. Counsel for the estate of Andrew Haukereid, Jr., deceased, has requested copies of all Amtrak police reports related to the Andrew Haukereid, Jr. investigation. Amtrak has

failed to turn over its police reports to the estate of Andrew Haukereid, Jr., deceased.

33.     For nearly four decades, Amtrak has had direct and certain knowledge that passengers, who are elderly, confused, disoriented and/or mentally impaired have had a propensity to exit moving trains through the exit doors located on Amtrak trains.

34.     Passengers exiting doors on moving trains routinely die upon impact with the ground. A few passengers have survived, and those who have survived have sustained severe and tragic injuries.

35.     Amtrak has known for nearly forty years that the doors on its trains are frequently, and easily, opened while the trains are in motion. The doors are opened either by mentally confused and/or disoriented passengers, or by Amtrak employees and/or passengers who like to smoke cigarettes or get some fresh air while traveling on the train.

36.     The only securing device located on the doors of the Amtrak passenger coach is something called a "dog latch." This device is easily unlatched with the flip of a finger.

37.     Moreover, it is very often the case that the dog latches on the doors are not latched properly as they should be, or that they are left unlatched by passengers and/or Amtrak employees who open doors in order to smoke cigarettes or get some fresh air.

38.     When the door of an Amtrak train is not secured with a dog latch, the door can jostle open due to the movement of the train. Amtrak has known this fact for years.

39.     On information and belief, Amtrak installed the dog latches on the doors of its passenger coaches for the purpose of preventing the doors from being jostled open.

40.     Amtrak has known for years that simple operation of the dog latch allows even mentally impaired people the ability to easily open the doors while the train is in motion.

41. Other than the dog latch, there is no other type of locking mechanism or safety device utilized by Amtrak to secure the doors while the trains are moving to prevent the opening of the doors, nor any system to notify the crew that a door is not properly latched.

42. Despite having notice of the fact that mentally impaired, confused, and/or disoriented passengers have a propensity to open doors and walk off moving trains, Amtrak, in complete, total and wholesale disregard to the risk such passengers are exposed, has done absolutely nothing to secure the doors of the train or otherwise protect mentally impaired, confused, and/or disoriented passengers from the train.

43. A listing of passengers who have suffered death or serious bodily injury as a result of falling out of a moving train, thereby giving Amtrak notice of the unreasonably dangerous condition of its passenger rail cars as constructed and operated is as follows:

(1) On or about September 2, 1972, Amtrak passenger Ralph Rhodes, age 80, exited a moving train to his death near Ipsis, California.

(2) On or about January 20, 1977, Amtrak passenger Cleotilde Amaya exited a moving train to her death near Vail, Arizona.

(3) On or about July 20, 1977, Amtrak passenger Estelle M. Hartman exited a moving train to her death near Brooks, Iowa.

(4) On or about September 17, 1977, Amtrak passenger George Jones exited a moving train to his death while traveling from Washington, D.C. to Camden, South Carolina.

(5) On or about May 14, 1978, Amtrak passenger Jesse Mazyck exited a moving train to his death near Wilson, North Carolina.

(6) In June of 1981, Amtrak passenger Margareta Alfred exited a moving train to her death near Auburn, California.

(7) On or about September 27, 1981, Amtrak passenger James J. Morrow exited a moving train to his death while traveling from Tampa, Florida to Columbia, South Carolina.

(8) On or about October 16, 1982, Amtrak passenger Hubert Newkirk, age 68, exited a moving train to his death near Cochise County, Arizona.

(9) On or about February 26, 1984, Amtrak passenger Robert Edward Berry exited a moving train to his death near Oxford, Nebraska.

(10) On or about March 12, 1984, Amtrak passenger Clarence E. Moore, age 84, exited a moving train near Rose Creek, Nevada.

(11) On or about April 15, 1984, Amtrak passenger David Adams exited a moving train near Aetna or Neoga, Illinois.

(12) On or about July 14, 1985, Amtrak passenger Hattie Wright Datcher exited a moving train near Lemon Springs, North Carolina.

(13) On or about January 1, 1986, Amtrak passenger Denise M. Raglund exited a moving train to her death near Wilmington, Delaware.

(14) On June 8, 1987, Amtrak passenger Kenneth Workman exited a moving train near Cambridge, Nebraska.

(15) On September 2, 1987, Amtrak passenger William Cudney exited a moving train.

(16) On May 16, 1988, Amtrak passenger Helen Hampton, age 73, exited a moving train near Fargo, North Dakota.

(17) On October 23, 1989, Amtrak passenger Delbert Jackson, age 82, exited a moving train near Columbiania, Ohio.

(18) On October 28, 1989, two Amtrak passengers, Dorothea and Arthur Kohfeld, both exited a moving train to their deaths in Middlepoint, Ohio.

(19) On June 22, 1990, Amtrak passengers Robert Henry Houston, age 63, exited a moving train to his death near Niland, California.

(20) On September 15, 1990, Amtrak passenger Edwin Peterson exited a moving train near Lewiston, Pennsylvania.

(21) On November 29, 1990, Amtrak passenger David Carl Spencer, age 73, exited a moving train to his death near Needles, California.

(22) On January 20, 1991, Amtrak passenger Danilo Quiambao exited a moving train near Marysville, California.

(23)  On April 18, 1991, Amtrak passenger Sven Kiilsgaard exited a moving train to his death near Pajaro, California.

(24)  On July 7, 1971, Amtrak passenger Howard Fredenburg, age 62, exited a moving train to his death near Grandin, North Dakota.

(25)  On February 3, 1992, Amtrak passenger Sylvia Langley exited a moving train to her death near San Bernadino, California.

(26)  On September 29, 1992, Robert Hall exited a moving train to his death near Columbia, South Carolina.

(27)  On October 12, 1992, Sam Springer exited a moving train near Princeton Junction, New Jersey.

(28)  On October 16, 1992, Florence Considine, age 57, exited a moving train near Price, Utah.

(29)  On November 23, 1992, Amtrak passenger Alex Curtis exited a moving train to his death near Alpine, Texas.

(30)  On December 12, 1992, Jeffrey A. Rossler exited a moving train near LaPorte County, Indiana.

(31)  On May 21, 1993, Edward L. Gray, III, age 27, exited a moving train to his death between Baltimore, Maryland and Philadelphia, Pennsylvania.

(32)  On December 24, 1993, Amtrak passenger Ilo "Ike" Eischeid, age 74, exited a moving train near Yuma, Arizona and was found by police wandering around the interstate bleeding.

(33)  On April 11, 1994, Min Soeny exited a moving train near Elizabethtown, New Jersey.

(34)  On May 4, 1994, Amtrak passenger Elbert Gross, age 69, exited a moving train to his death while taking a trip between Hartford, Connecticut and Evergreen, Alabama.

(35)  On May 25, 1994, Amtrak passenger Eleanor Kisendahl exited a moving train near Lakot, North Dakota.

(36)  On September 15, 1994, Amtrak passenger Robert Harris, age 87, exited a moving train to his death near Yuma, Arizona.

(37)  On November 22, 1994, Amtrak passenger Autholia Delce exited a moving train near China, Texas.

(38)  On July 18, 1995, Amtrak passenger John Williams exited a moving train near Leetsdale, Pennsylvania.

(39)  On September 27, 1995, Amtrak passenger Frank Vojcak exited a moving train to his death near Bluestem, Washington.

(40)  On March 24, 1996, Amtrak passenger Tom Whitestone exited a moving train near Anniston, Alabama.

(41)  On March 28, 1996, Amtrak passenger Victor Gust, age 76, exited a moving train near D'Hanis, Texas.

(42)  On or about July 31, 1996, Amtrak passenger Charles Whitworth exited a moving train to his death near Holbrook, Arizona.

(43)  On or about September 19, 1996, Amtrak passenger William Swanson, age 54, exited a moving train near Hammond, Indiana.

(44)  On or about February 27, 1997, Amtrak passenger Randall Harris exited a moving train in Saronville, Nebraska.

(45)  On April 6, 1997, Amtrak passenger Herbert Sudds exited a moving train that was traveling from Florida to Cleveland.

(46)  On April 17, 1997, Amtrak passenger Gerhardt Soyck exited a moving train near Texarkana, Arkansas.

(47)  On June 2, 1997, Amtrak passenger Maurice Fisher exited a moving train near Ottowa County, Ohio.

(48)  On March 8, 2000, Amtrak passenger Helen Dorens exited a moving train.

(49)  On May 7, 2003, Amtrak passenger Ronald Donis exited a moving train traveling from Illinois to California.

(50)  On April 29, 2008, Amtrak passenger Joseph Pineda exited a moving train.

(51)  On June 30, 2009, Amtrak passenger Fred J. Lucero exited a moving train and fell to his death.

(52) On or about August 18, 2010, Amtrak passenger Agostinho Carlos Sadi, age 51, exited a moving train near Troy, Montana and fell to his death.

(53) On September 9, 2010, Amtrak passenger Barbara Arteta, age 63, exited a moving train while the train was traveling near Sanford, Georgia.

(54) On September 13, 2012, Amtrak passenger Charlie Dowd, age 68, exited a moving train to his death in Nebraska.

44. On information and belief, Amtrak has had an opportunity to learn about the propensity of medically confused passengers exiting its trains not only as a result of the numerous deaths over the past decades but also as a result of litigation filed by deceased passenger's survivors. Cases have been brought by the estate of Ralph Rhodes, the estate of Estelle M. Hartman, the estate of Jesse Mazyck, the estate of James J. Morrow, the estate of Hubert Newkirk, the estate of Robert Edward Berry, the estate of Hattie Wright Datcher, the estate of Denise M. Raglund, the estate of Helen Hampton, the estate of Danilo Quiambao, the estate of Sven Kiilsgaard, the estate of Alex Curtis, the estate of Eleanor Kiesendahl, the estate of Robert Harris, the estate of Herbert Sudds and the estate of Fred J. Lucero.

45. The case of *Kiilsgaard v. Amtrak* is illustrative of Amtrak's reckless disregard of the safety of its passengers and provided Amtrak certainty of facts as to the defective nature of its doors.

46. Following the death of Reverend Kiilsgaard on April 18, 1991, a lawsuit was filed against Amtrak in the Superior Court of the State of California, County of Monterey, Case No.93118. The non-jury case was decided by the Honorable Richard M. Silver in March and April of 1997.

47. Judge Silver ruled in the Court's Statement of Decision filed August 12, 1997 that Sven Kiilsgaard suffered from a seizure disorder that resulted in confusion, disorientation, impaired perceptions and confusion as to surroundings.

48. Judge Silver found as fact that "prior to this accident [Amtrak] was on notice that, notwithstanding instructions to the contrary, on occasions employees would negligently secure the 'dog latch'; that the 'dog latch' had a tendency to move, or 'migrate' during train operations; and that on occasion passengers would open the door or window 'to smoke' or get 'fresh air'."

49. Judge Silver found as fact that ". . . prior to this accident, [Amtrak] was, or should have been, aware of numerous older and/or mentally confused persons who had fallen from the moving train from the types of doors here in question."

50. Judge Silver received evidence of several incidents involving passengers who had exited moving trains and concluded, based upon the evidence that "[t]hese incidents were admitted and considered only to the extent that they put defendant on notice of falls from trains by elderly, mentally confused, or intoxicated passengers and the need to review and consider door or other safety concerns for such passengers.

51. Judge Silver found as fact "[t]he evidence established that a covering over the lock, appropriately marked and secured, better signing, and some type of mechanism (e.g. a light, a snap locking chain or alarm bell) could have been installed without compromising safety in the event of a train accident and which would have prevented a person in a confused or disoriented state from opening the exit doors by mistake. The weight of the evidence established that these devices were well within the technological ability of [Amtrak] to install and, in fact, have been in use on some of [Amtrak's] trains for many years."

52. Judge Silver found as fact "[b]ased on the evidence presented the above indicated changes are feasible, are used on other public transit, and would have prevented [Reverend Kiilsgaard] and others from confusing the exit doors with others in the vicinity."

53. Judge Silver found as fact "[t]he Court finds by a preponderance the evidence, that [Amtrak] breached its duty to [Reverend Kiilsgaard] by its failure to act to take reasonable steps to secure the door as indicated above. Further, the Court finds that the cost of this would not unreasonably interfere with interstate commerce and that this matter is not preempted by federal laws."

54. Judge Silver found as fact that "[n]otwithstanding the information available to [Amtrak] regarding the pattern of these accidents, they took no action whatsoever to either investigate whether the doors could be more safely secured or, in fact, to do anything to prevent the doors from being accidently opened while the trains were moving."

55. Amtrak appealed the verdict entered against it in *Kiilsgaard v. Amtrak*.

56. The Court of Appeals of the State of California, Sixth Appellate District, in an opinion filed June 30, 2009, affirmed the verdict rendered by Judge Silver. On information and belief, Amtrak did not take any further appeal in the *Kiilsgaard v. Amtrak* matter.

57. Amtrak has also been put on notice as a result of its own internal investigation into these incidents. A memorandum filed by Amtrak employee George Cantlay on August 3, 1996 regarding a meeting held during the investigation into the death of Charles Whitworth, concluded in part that "[t]he point was made by those present during the interview that occurrences with elderly/senile/mentally unstable passengers have been happening with such regularity as to have become routine."

## DIRECT AND VICARIOUS LIABILITY

58. Amtrak is directly liable for all negligent acts and omissions by Amtrak described herein.

59. At all times mentioned herein, Amtrak's employees were acting within the scope of their authority as agents of Amtrak, and Amtrak is vicariously liable for all negligent acts or omissions by those employees described herein.

## BREACH OF DUTY OF COMMON CARRIER

60. All allegations herein are incorporated in this count.

61. As a common carrier, Amtrak has a duty to use the highest degree of care consistent with the type of conveyance used and the practical operation of its business. The horrific and tragic death of Andrew Haukereid, Jr. was caused by Amtrak's failure to use the highest degree of care in the following particulars:

(1) Despite having certain knowledge that mentally confused and disoriented passengers have a propensity to exit its moving trains, Amtrak failed to inform and train its employees of such propensities and to educate them on how to respond to such passengers and to monitor and attend to such passengers;

(2) Despite having certain knowledge that the doors on its trains could easily, and economically, be made safer so as to protect and prevent against mentally confused and disoriented passengers, among others, from falling out of its trains, Amtrak has knowingly and consciously done nothing to make its doors safer;

(3) In knowingly and consciously hiding from Amtrak employees the fact that numerous passengers who have exhibited signs of confusion, disorientation and/or mental impairment have accidently opened the doors on moving trains and fallen from trains to their death which information had it been disclosed to the employees would have enhanced their awareness of Andrew Haukereid, Jr.'s confused condition and caused them to carefully observe and prevent him from exiting the train;

    (4)    In failing to investigate the potential that Andrew Haukereid, Jr.'s disappearance was the result of his having fallen from the train and in failing to inform Scott Haukereid and Greg Haukereid of that potential.

    (5)    In choosing to promote its own interests in attempting to make a profit over the safety of its passengers by (a) knowingly and consciously refusing to spend money in order to train its employees about the increased risk confused, elderly and/or disoriented passengers are exposed to as a result of the dangerous doors located on the train and how to protect them from harm, (b) knowingly and consciously refusing to modify the exit doors on the train to make them safer for such passengers and (c) by choosing instead to litigate the claims arising out of the deaths of such passengers because, on information and belief, paying the damage for a death or severe injury claim is significantly cheaper for Amtrak than training its employees and/or retrofitting the doors on its trains.

62. Despite being on notice of Andrew Haukereid, Jr.'s confused and disoriented state, Amtrak employees failed to protect Andrew Haukereid, Jr., from injury and did so despite the fact that it was, or should have been, reasonably foreseeable that Andrew Haukereid, Jr. in his confused and disoriented would exit the moving train to his death.

63. Amtrak is liable for the failure of its employees to use the highest degree of care for trains and the practical operation of a train business.

## OUTRAGE

64. All allegations herein are incorporated in this count

65. The failure of Amtrak to investigate the potential of Andrew Haukereid, Jr. having fallen from the train and its failure to inform Scott Haukereid and Greg Haukereid of that potential, greatly increased the harm and grief that was suffered on account of this incident. Such cavalier conduct in light of Amtrak's obligations and the history of such tragedies, reflects such a conscious indifference to the wellbeing of its passengers and those to who they are dear as to constitute a separate tort in its own right, actionable on account of its outrageous nature.

66. Amtrak willfully and wantonly engaged in the extreme and outrageous conduct described herein, and such conduct proximately caused damage to Scott Haukereid and Greg Haukereid in the nature of emotional stress, constituting the tort of outrage.

### DAMAGES

67. Amtrak's breach of duty as a common carrier actually and proximately caused Andrew Haukereid, Jr.'s death and the plaintiff claims the following compensatory damages on behalf of the estate:

   (1)   permanent injuries;

   (2)   conscious pain and suffering of Andrew Haukereid, Jr. prior to his death;

   (3)   scars and disfigurement and visible results of the injury sustained by the Andrew Haukereid, Jr. prior to his death;

   (4)   the loss of Andrew Haukereid, Jr.'s life;

   (5)   the reasonable value of funeral expenses;

   (6)   mental anguish; and

   (7)   all other damages which Andrew Haukereid, Jr. would have been able to recover had he lived.

68. In addition, at the time of his death, Andrew Haukereid, Jr. was survived by the following known wrongful death beneficiaries:

   (1)   Scott Haukereid; and

   (2)   Greg Haukereid.

69. Amtrak's breach of duty as a common carrier, and its extreme and outrageous conduct, actually and proximately caused Andrew Haukereid, Jr.'s known wrongful death beneficiaries to suffer the following damages:

   (1)   pecuniary injuries; and

(2) mental anguish suffered and reasonably probable to be suffered in the future; the later damages having been greatly and unnecessarily enhanced by Amtrak's failure to properly investigate and inform Scott Haukereid and Greg Haukereid of the potential of Andrew Haukereid, Jr. to have died by falling from its train.

## PUNITIVE DAMAGES

70. As noted extensively above, Amtrak knew or ought to have known, in the light of the surrounding circumstances, that its conduct described herein would naturally and probably result in injury and damage, and Amtrak continued such conduct in reckless disregard of the consequences, from which malice may be inferred.

71. Punitive damages should be imposed to punish Amtrak and to deter Amtrak and others from similar conduct.

## JURY DEMAND

72. Scott Haukereid, Individually and as Personal Representative and Administrator of the Estate of Andrew Haukereid, Jr., deceased, demands trial by jury.

WHEREFORE, Scott Haukereid, Individually and as Personal Representative and Administrator of the Estate of Andrew Haukereid, Jr., deceased, prays for judgment and recovery against Amtrak, in a sum in excess of the federal jurisdictional limits in diversity cases; post judgment interest where applicable; costs expended herein and for all other relief to which he may be entitled.

Respectfully submitted,

SCOTT HAUKEREID, Plaintiff

By: James Bruce McMath, AR Bar No. 75090
Neil Chamberlin, AR Bar No. 93222

Carter C. Stein, AR Bar No. 2004049
McMATH WOODS P.A.
711 West Third Street
Little Rock, AR 72201
phone: (501) 396-5400
fax:    (501) 374-5118
email: <u>bruce@mcmathlaw.com</u>
       <u>neil@mcmathlaw.com</u>
       <u>carter@mcmathlaw.com</u>